UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES DIVISION/IBT,<br><br>Plaintiff,<br><br>v.<br><br>BNSF RAILWAY, INC.,<br><br>Defendant. | No. CV 15-5091 PA (PJWx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter is before the Court on Defendant BNSF Railway, Inc.'s ("BNSF") Motion for a Preliminary Injunction. After fully reviewing the evidence and the parties' arguments, the Court finds the following findings of fact and conclusions of law. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

**I.     Findings of Fact**

1.     BNSF is a major freight railroad operating more than 1,000 trains each day over 32,500 miles of track in twenty-eight states.

2.     BMWED is a labor union representing maintenance of way workers, i.e. workers who maintain track, bridges, and other infrastructure.

3. BNSF and BMWED members are parties to multiple collective bargaining agreements, including the 2004 ATSF-BMWED agreement (the "CBA" or "2004 Agreement").

4. Rule 13 of the 2004 Agreement provides, among other things, that BNSF may not "unjust[ly]" discipline BMWED members. BNSF must also provide BMWED members written notice of any disciplinary investigation and conduct a formal investigation hearing.

5. Rule 14 of the 2004 Agreement provides, among other things, for a grievance process by which BMWED members may raise concerns about BNSF's violation of the 2004 Agreement. BMWED members are entitled to appeal to BNSF's highest officer designated to handle such disputes. If necessary, they may then appeal to the National Railroad Adjustment Board ("NRAB") or another board of adjustment agreed to by the parties.

6. Bobby Tindell ("Tindell") is employed by BNSF as a senior track supervisor in Needles, California and belongs to BMWED.

7. Early in 2015, Tindell believed that BNSF was improperly denying him priority for overtime assignments in favor of more junior colleagues. )

8. When overtime is assigned to a junior track supervisor, a senior track supervisor may file a time claim to recover overtime that should have been assigned to him or her under the CBA. Tindell filed between twenty-five and forty time claims in 2015.

9. Tindell sought information about his colleagues' overtime to support his time claims.

10. Tindell first turned to a computerized BNSF payroll system to review his junior colleagues' overtime.

11. One of the colleagues whose time records Tindell viewed was Kyle Sahlstrom ("Sahlstrom"). Sahlstrom complained to BNSF management when he learned that Tindell had accessed his time records. BNSF Division Engineer Jimmy

Capps ("Capps") addressed Sahlstrom's complaint by sending Tindell an email in March 2015 directing him not to use the payroll system in this way.

12. Tindell complied with the order not to access the payroll system to review others' time records, but began asking colleagues to tell him about any overtime assignments they might receive. Two of the colleagues he approached were Sahlstrom and Nicholas Mazanowski ("Mazanowski"). Sahlstrom complained to management.

13. On April 17, 2015, BNSF notified Tindell that it was conducting an investigation stemming from his creation of an "unpleasant work environment" by confronting colleagues about their overtime.

14. The investigation hearing was held on May 15, 2015. Tindell was represented by a union official, Brian Poston ("Poston"), and witnesses included Capps; Sahlstrom; Mazanowski; Frank Barrera ("Barrera"), Tindell's immediate supervisor; and Michael Bradley ("Bradley"), one of Tindell's colleagues. Sahlstrom testified that he felt "harassed" by Tindell's inquiries about his overtime pay: "I just felt it wasn't any of his business and he just kept asking me, and he would brag about what he knows and brag about printing up everybody's pay . . . ."

15. On June 1, 2015, BNSF assessed Tindell "a Level S 30 Day Record Suspension" and a one year "review period" during which "[a]ny rules violation . . . could result in further disciplinary action." BNSF determined that Tindell was "in violation of MWOR [Maintenance of Way Operating Rule] 1.6 Conduct and MWOR 1.13 Reporting and Complying with Instructions" based on his "confronting [colleagues] about their overtime pay after it was clearly instructed for [him] to stop."[1]

---

[1] MWOR 1.6 prohibits employees from, among other things, being quarrelsome or discourteous. MWOR 1.13 requires employees to "report to and comply with instructions from supervisors who have the proper jurisdiction . . . ." Defendant
(continued...)

-3-

16. On June 22, 2015, Tindell received notice of another investigation based on his use of inappropriate language during an argument with Sahlstrom. Sahlstrom had objected to Tindell's overtime claims during a meeting and suggested that "we all just need to handle our own shit." Tindell told Sahlstrom to "sack up" and put in his own overtime claims per the union agreement. Sahlstrom responded, "fuck the union" and "fuck the union agreement."

17. Capps testified that in his opinion Sahlstrom's comments to Tindell "did not warrant discipline." He added that "HR has got an ongoing investigation on Mr. Sahlstrom and his conduct."

18. Meanwhile, in Arizona, track supervisor Carlos Zamora ("Zamora") filed his own time claim. On July 8, 2015, Zamora's supervisor, Willie Naron ("Naron"), questioned him about his time claim and threatened to write him up for failing to finish a task in a timely manner.

19. BMWED initiated this action on July 6, 2015. In its First Amended Complaint ("FAC"), BMWED seeks a declaration that "BNSF's investigation and disciplining of Mr. Tindell for his efforts to gather information to determine whether BNSF violated the CBA in assigning overtime work, and for use as evidence in support of a time claim or grievance, and BNSF's threat of discipline of Mr. Zamora for filing a time claim, violated Section 3 of the [Railroad Labor Act ("RLA")] by imposing discipline and penalties on use of the statutorily mandated minor dispute resolution processes of the RLA."

20. On July 17, 2015, BMWED sent BNSF a notice that they would strike if BNSF did not rescind Tindell's discipline within ten days. BNSF filed an Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re:

---

[1]/  (...continued)
conceded that the reference to an MWOR 1.13 violation was in error.

Preliminary Injunction on July 22, 2015. The parties stipulated to the withdrawal of the Application for Temporary Restraining Order, and the Court scheduled a hearing on BNSF's Motion for Preliminary Injunction.

## II.     Conclusions of Law

1.     Pursuant to Section 7 of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 107, the Court may issue an injunction involving a labor dispute only after hearing the testimony of witnesses in open court and finding:

>    (a)     That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained . . .;
>    (b)     That substantial and irreparable injury to complainant's property will follow;
>    (c)     That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
>    (d)     That complainant has no adequate remedy at law; and
>    (e)     That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.[2]

2.     In the Ninth Circuit, any party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer

---

[2] BMWED cites Section 4 of the NLGA, 29 U.S.C. § 104, to argue that the Court has no jurisdiction to enjoin striking and picketing. (Opp. at 8.) This is incorrect: Courts may enjoin strikes concerning arbitrable disputes. See Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO, 428 U.S. 397, 407, 96 S. Ct. 3141, 3147, 49 L. Ed. 2d 1022 (1976) ("Striking over an arbitrable dispute would interfere with and frustrate the arbitral processes by which the parties had chosen to settle a dispute.").

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).[3/]

3.  A strike or work stoppage is "unlawful" under § 107, and BNSF is therefore "likely to succeed on the merits" under Winter, if the strike concerns a "minor" dispute subject to mandatory arbitration under the RLA, 45 U.S.C. § 151, et seq. Minor disputes are those "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153(i). When a railroad takes the position that a dispute concerns interpretation of an existing agreement, the dispute is minor unless the railroad's position is "'not arguably justified,' 'obviously insubstantial,' 'spurious,' [or] 'frivolous' . . . ." Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 306, 109 S. Ct. 2477, 2483 (1989) [hereinafter "ConRail"]. These formulations "'illustrate the relatively light burden which the railroad must bear' in establishing exclusive arbitral jurisdiction under the RLA." Id. (quoting Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R. Co., 802 F.2d 1016, 1022 (8th Cir. 1986)); see also Ass'n of Flight Attendants v. Mesa Air Grp., Inc., 567 F.3d 1043, 1047 (9th Cir. 2009) ("When in doubt, courts construe disputes as minor.").

4.  BMWED's threatened work stoppage arises from a minor dispute. BNSF's discipline of Tindell arises from its interpretation of existing agreements, and BNSF's position that Tindell's discipline is justified because he harassed colleagues is not frivolous. See Brotherhood of Maintenance of Way Employees Division/IBT v. Norfolk Southern Ry. Co., 745 F.3d 808, 815 (7th Cir. 2014) (holding that a

---

[3/]  BMWED contends that the public interest is not relevant in an NLGA case. The Court notes the public interest here only in relation to the Winter framework. It does not factor into the Court's analysis under Section 7 of the NLGA.

dispute arising from employee discipline was a "quintessential" minor dispute). Accordingly, the threatened strike is unlawful.

5. The threatened strike is unlawful because it arises from a minor dispute.

6. The threatened strike would likely cause substantial and irreparable injury to BNSF insofar as it would cause delays and disruptions lasting beyond the strike and cause BNSF to suffer a loss of customer goodwill.

7. The harm to BNSF in the event of a strike vastly exceeds the harm to BMWED and its members if the strike is enjoined because the only effect of an injunction will be to force BMWED's members to arbitrate their grievances.

8. BNSF has no adequate remedy at law and public officers are otherwise unable to protect its interests.

9. An injunction is in the public interest because the threatened work stoppage would impact members of the public who rely on timely and uninterrupted rail service.

### III. Analysis

BMWED argues that a preliminary injunction is not appropriate because the threatened strike arises from a major dispute based on BNSF's violation of the RLA. BMWED alleges that BNSF's stated reasons for disciplining Tindell and threatening to discipline Zamora are mere pretext for retaliating against employees pursuing time claims. According to BMWED, these pretextual reasons are based on frivolous interpretations of the relevant agreements. BMWED also argues that Section 8 of the NLGA[4] precludes an injunction because BNSF has violated the RLA by retaliating against its employees. Finally, BMWED argues that the balance of harms tips in its favor. The Court concludes, after reviewing the evidence, that the dispute is minor, that BNSF has not violated the RLA, and that the balance of harms tips in BNSF's favor.

**A.    The Dispute is Minor**

---

[4]    29 U.S.C. § 108.

BMWED points to five purported facts in support of its position that BNSF's discipline of Tindell is pretextual and not based on an arguably justified interpretation of relevant agreements: (1) Tindell complied with all directives regarding his gathering information to support a time claim; (2) colleagues whom Tindell interrogated about their overtime did not testify that Tindell threatened or intimidated them; (3) BNSF refused to provide overtime data despite representing that it would do so; (4) in investigating Tindell for his use of inappropriate language, BNSF did not also investigate Sahlstrom for using more extreme language; and (5) Zamora was threatened with discipline on account of his filing a time claim.

### 1. Tindell was not disciplined for failure to follow instructions

BMWED contends that Tindell did not access payroll data after he was told to stop and that Tindell was never specifically directed not to question colleagues about overtime. However, as explained by Capps, Tindell was only disciplined for his harassment of colleagues—not for failure to comply with instructions.

### 2. Tindell's interrogation of colleagues arguably justified discipline for creating an unpleasant work environment

BMWED argues Tindell's interrogation of Sahlstrom and Mazanowski does not support a finding that he created an "unpleasant work environment" because neither Sahlstrom nor Mazanowski testified that they felt threatened or intimidated. Sahltstrom did testify, however, that he felt "harassed" by Tindell. Regardless of whether or not Tindell spoke to Sahlstrom and Mazanowski in a civil tone, BNSF's determination that the conversation created an unpleasant work environment is not frivolous in light of Sahlstrom's testimony.[5]

### 3. BNSF's refusal to provide overtime data does not undermine its reasons for disciplining Tindell

---

[5] The Court takes no position on the truth of Sahlstrom's testimony. It is sufficient that this testimony presents an arguable basis for BNSF's disciplinary decision.

BMWED maintains that Capps contradicted his hearing testimony that he would have provided overtime data upon request. However, BMWED fails to adequately explain how this undermines the stated reasons for Tindell's discipline. BMWED also suggests that Capps made Tindell's conduct appear worse than it was by testifying that Tindell could have obtained the information he was seeking from other sources. Even if Tindell had no direct means to investigate a potential overtime claim,[6] BNSF could still determine that Tindell's conversation with Sahlstrom and Mazanowski created an unpleasant work environment.

### 4. BNSF's purported investigation of Tindell, and not Sahlstrom, for use of inappropriate language is arguably justified

BMWED argues that BNSF's investigation of Tindell for telling Sahlstrom to "sack up" and file overtime claims is pretextual in light of its failure to discipline Sahlstrom for saying "fuck the union" and union agreement.[7] However, BNSF could reasonably take the position that Tindell's language was more abusive because Tindell's comments criticized Sahlstrom personally whereas Sahlstrom's comments concerned the union.

### 5. BNSF's threatened investigation of Zamora does not undermine its reasons for disciplining Tindell

BMWED argues that BNSF's threatened discipline of Zamora is further evidence that BNSF disciplined Tindell in an effort to chill challenges to its assignment of overtime to junior track supervisors. However, BNSF has not launched an investigation of Zamora. Moreover, Zamora's supervisor, Naron, had nothing to do with the investigation of Tindell.

---

[6] Gary Marquart, a BMWED officer, testified that the CBA does not provide for discovery in support of time claims. (Tr. 37:24-38:5.) However, there is no evidence that BMWED could not solicit overtime data from its members.

[7] Capps testified that an investigation of Sahlstrom is pending.

Accordingly, BNSF's determination that Tindell's harassment of colleagues created an unpleasant work environment is arguably justified.

### B. RLA and NLGA

BMWED argues that BNSF has "undermined or negated the grievance arbitration process" in violation of the RLA by retaliating against Tindell and Zamora for submitting time claims. Section 8 of the NLGA provides that "[n]o restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." BMWED suggests that because BNSF retaliated against employees in violation of the RLA, the Court lacks jurisdiction to enjoin the threatened strike. In other words, BNSF's violation of the RLA is sufficient to sidestep the ConRail analysis and requires the Court to resolve BMWED's claims on the merits.

Although BMWED cites cases that injunctive relief is not available to a party who has violated the RLA,[8] it cites no analogous cases in which a court lacked jurisdiction to enjoin a strike because employee discipline violated the RLA. This would turn the RLA on its head. Unions could cast any dispute involving employee discipline as a violation of the RLA and strike, despite the fact that "'the purpose' of Section 8 'is to head off strikes,' not encourage them." Aircraft Serv. Intern., 779 F.3d at 1079. "[T]he 'over-all policy' of the RLA and the NLGA is the same: 'to

---

[8] See, e.g., Brotherhood of Ry. Trainmen, Enterprise Lodge, No. 27 v. Toledo, P. & W. R.R., 321 U.S. 50, 55, 64 S. Ct. 413, 416-17 (1944); Ry. Exp. Agency, Inc. v. Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, 437 F.2d 388, 394 (5th Cir. 1971); United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO, 243 F.3d 349, 364-65 (7th Cir. 2001); Norfolk & Western Ry. Co. v. Brotherhood of R.R. Signalmen, 164 F.3d 847, 856 (4th Cir. 1998); Aircraft Serv. Intern., Inc. v. Int'l Brotherhood of Teamsters, 779 F.3d 1069 (9th Cir. 2015).

encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes.'" Id. (quoting Toledo, 321 U.S. at 58, 64 S. Ct. at 413). BMWED may pursue its retaliation theory in arbitration. There is no indication that BNSF is unwilling to submit to arbitration. Rather, BMWED is the party seeking to sidestep the nonjudicial processes to which the RLA and NLGA channel such disputes.

### C. Balance of Harms

BMWED argues that "all of the harm that BNSF alleges would result from a strike would be precipitated by BNSF's own unlawful actions" and that BMWED will be irreparably harmed by an injunction because "no arbitrator has the authority to compel compliance with the RLA." If BNSF has, in fact, disciplined Tindell in violation of the RLA or pursues an investigation against Zamora, an arbitrator can fashion an appropriate remedy.

### Conclusion

For all of the foregoing reasons, BNSF's motion for a preliminary injunction is granted.

DATED: September 22, 2015

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE